IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHARAOH E. BROOKS,<br><br>        Petitioner,<br><br>vs.<br><br>ERIC ARNOLD, Warden, California State Prison, Solano,[1]<br><br>        Respondent. | No. 2:11-cv-01637-JKS<br><br>MEMORANDUM DECISION |

Pharaoh E. Brooks, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Brooks is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Solano. Respondent has answered, and Brooks has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On December 19, 2006, Brooks was charged with attempted willful, deliberate, and premeditated murder (count 1), first-degree residential burglary (count 2), and assault by means of force likely to produce great bodily injury or with a deadly weapon (count 3). The information further alleged as to all counts that Brooks personally inflicted great bodily injury. It additionally alleged as to count 2 that a non-accomplice had been present during the commission of the burglary, making the crime a violent felony. Brooks pled not guilty, denied the allegations, and proceeded to jury trial. On direct appeal of his conviction, the California

---

[1] Eric Arnold, Warden, California State Prison, Solano, is substituted for M. McDonald, former Warden, California Correctional Center. FED. R. CIV. P. 25(c).

Court of Appeal described the following events underlying the charges against Brooks and the

evidence presented at trial:

> Evidence adduced at trial showed that [Brooks] and Mychal Lewis, Jr., had been friends for at least 13 years when they happened to run into each other at a shopping mall and at a mutual friend's house on June 23, 2006.  On both occasions, [Brooks] and Lewis exchanged pleasantries and went about their separate ways.  By all accounts, no one was aware of any current or past animosity between [Brooks] and Lewis.
>
> Sometime after 11:45 p.m. that night, Lewis arrived at the El Rancho Bar in Lodi.  Upon arrival, he received a hug from his friend, Karen Sisneros.  Sisneros was there with Melody Tucker.  Sisneros and Tucker had been friends with [Brooks] and Lewis for about three years.
>
> Charles Thornburg, the security guard who was working at the El Rancho that evening, recalled seeing [Brooks] there sometime that evening for a short time—arriving between 10:00 and 10:30 p.m.  Tucker and the bartender did not remember [Brooks] being at the bar that night.  Sisneros was not asked about whether she saw [Brooks] at the bar.
>
> Sisneros, Tucker, and Lewis had a few drinks, spending an uneventful evening at the bar until it closed at 1:45 a.m. on June 24, 2006.  They drove five minutes to Sisneros's house and went to her bedroom.
>
> Sisneros, Tucker, and Lewis relaxed and talked about Sisneros's upcoming birthday.  Sisneros was seated at her computer, Tucker was sitting on the edge of the bed, and Lewis stood near the bed.  Lewis was looking at a photo album and had his back to the door.
>
> About 10 to 15 minutes elapsed before [Brooks] walked in with a silver baseball bat.  [Brooks] had not been invited to Sisneros's house, and she did not know he was coming over.
>
> [Brooks] immediately hit Lewis in the head with the bat, causing him to collapse into Tucker's lap.  Lewis was unconscious.  [Brooks] appeared angry and continued to hit Lewis's head and back with the bat.  For the next 30 to 90 seconds, [Brooks] continuously rained hard blows on Lewis.  Sisneros heard [Brooks] say something about "business" before he ran out of the room.
>
> Sisneros pulled Lewis off of Tucker, laid him on the ground, and put a pillow under his head.  Sisneros turned Lewis on his side because blood was coming from his mouth.  She then saw that he was bleeding all over.  Sisneros called 911, and Tucker took over the call to explain the need for help.  Sisneros then called Lewis's former girlfriend, Sara Gravelle, to tell her that she needed to come over quickly.
>
> Gravelle arrived at Sisneros's house shortly after the ambulance took Lewis to the hospital.  Neither Sisneros nor Tucker initially told Gravelle or the police officer who first arrived at the scene what had happened other than that Lewis had been attacked with a bat.  Sisneros and Tucker did not identify [Brooks] to the police because they were afraid he would attack them too.  Sisneros told the police officer only that the attacker

was a black male, approximately 30 years old, and was wearing a dark t-shirt and jeans. Tucker told another officer that the attacker was six feet tall and weighed 210 pounds.

After the ambulance left Sisneros's house, Gravelle and Sisneros drove to the hospital together.  Sisneros then told Gravelle that [Brooks] was the attacker.

Lewis arrived at the hospital in critical condition.  He was in a coma and needed to be intubated to assist his breathing.  Lewis had multiple skull fractures on the right side of his head.  As a result, he was bleeding into his brain. Lewis was also bleeding externally from his face and right ear.  Lewis's lung was bruised, and he had a lacerated liver.

Lewis's emergency room physician believed he might die from the injuries. Due to Lewis's grave condition, he was air-lifted to Stanford Medical Hospital where he remained in a coma for 38 days.

After Lewis was transferred to Stanford Medical Hospital, Sisneros and Gravelle drove to Stockton to tell his family what had happened.  They arrived at the home of Helen Jones.  Although Jones was not a blood relative, Lewis referred to her as his aunt because he had lived with her for several years while growing up.  When Jones learned that [Brooks]—whom she had known for years as Lewis's friend—was the attacker, she urged Sisneros to tell the police.

At 10:55 p.m. that evening, Sisneros spoke with Detective Nick Welton of the Lodi Police Department.  Sisneros appeared to be nervous and afraid while recounting the attack.  She did not identify the attacker.  After speaking with Jones, Sisneros called the detective back at 12:30 a.m. on June 25, 2006.  Shortly after 1:00 a.m., Detective Welton met with Sisneros.  She identified [Brooks] as Lewis's attacker.  Later that day, Tucker spoke with Detective Tim Fritz and identified [Brooks] as the attacker.

At 6:00 p.m., Detectives Welton and Fritz searched [Brooks'] residence pursuant to a search warrant.  [Brooks] was not home.  Shortly thereafter, Detective Welton learned that [Brooks] had driven to Chicago, Illinois.  On June 29, 2006, [Brooks] was arrested in St. Louis, Missouri, during the first scheduled stop of a bus traveling from Chicago to Reno, Nevada.

[Brooks] testified on his own behalf.  He recounted seeing Lewis at the shopping mall and at a mutual friend's house on the day before the beating.  [Brooks] and Lewis talked amicably for a few minutes on both occasions.  They were not fighting about anything.

[Brooks] explained that he worked until 11:00 p.m. on June 23, 2006, and could not have been at the El Rancho bar between 10:00 and 10:30 p.m. as Thornburg had testified.  After getting off work, [Brooks] drove straight home and arrived at his house between 11:20 to 11:30 p.m.  His girlfriend, Diana Murray, was there.  About five to 10 minutes after [Brooks] arrived at home, his friends John McNabb and Christopher Ramirez came to his house.  McNabb and Ramirez stayed for about an hour.

Around 12:30 a.m., [Brooks] drove to Safeway to shop for groceries.  [Brooks] returned home by 1:00 a.m. and made himself something to eat.  He testified to being in bed by 1:30 a.m. on June 24, 2006.

[Brooks] woke up between 10:00 and 11:00 a.m.  He went to work from 2:30 until 11:00 p.m. at his job as a licensed vocational nurse.

-3-

The following day, Murray awakened [Brooks] to tell him that her mother was ill in Chicago, Illinois.  [Brooks] called another nurse at work, saying that he needed to take time off for a family emergency.  The same day, [Brooks] began the drive to Chicago with Murray.  While driving, [Brooks] received a call informing him that Lewis had been attacked and that the police had searched [Brooks'] house.  [Brooks] planned to drop Murray off in Chicago before returning to California to turn himself in.

After arriving in Chicago, Murray's brother bought a ticket under his own name for [Brooks] to travel to Reno, Nevada.  [Brooks] planned to have his father, who lived in Nevada, drive him to Stockton to turn himself in.  However, [Brooks] was arrested when the bus stopped in St. Louis, Missouri.

[Brooks'] father and several of his friends testified that [Brooks] had a reputation for kindness and nonviolence.

McNabb corroborated [Brooks'] testimony about being at home the night of the crime.  McNabb estimated that he and Ramirez left [Brooks'] house shortly after midnight.

Ryan Schenone, who bartended at the El Rancho bar on the night of the attack, testified that he did not see [Brooks] at the bar that evening.

In his closing argument, defense counsel urged the jury to conclude that [Brooks] was not the person who attacked Lewis.  To this end, counsel argued: "There's certainly, as I said in my opening, no dispute about whether [Lewis] was injured.  He certainly was. [¶]  Obviously the only—and certainly that is, um, a tragedy that that happened, . . . but the only issue for you here is whether there's any reasonable doubt about whether [Brooks] did this, whether he's in fact guilty."

*People v. Brooks*, No. C058856, 2009 WL 4350563, at *1-4 (Cal. Ct. App. Dec. 2, 2009).

At the conclusion of trial, the jury found Brooks guilty as charged and found true all enhancements.  The court subsequently sentenced Brooks to an indeterminate term of life imprisonment with the possibility of parole on count 1; a consecutive determinate term of four years on count 2; and a consecutive mid-term sentence on count 3, which was stayed pending successful completion of the sentence imposed for count 2.  The court additionally imposed a consecutive sentence of three years, for a total determinate sentence of sevens years.

Through counsel, Brooks appealed his conviction, arguing that: 1) the evidence was legally insufficient to sustain his attempted first-degree murder conviction; 2) he was denied his rights to counsel, due process, and a fair trial when the trial court failed to notify counsel of a

-4-

request for a readback of Tucker's testimony and did not allow the jury to rehear the testimony; 3) the trial court erred in failing to instruct the jury on the lesser-included offense of attempted voluntary manslaughter; 4) the jury instructions on attempted murder "improperly suggested that evidence of a direct step established a conclusive inference of intent to kill;" 5) the trial court abused its discretion when it denied the defense's request for a continuance to secure the attendance of an alibi witness; 6) the prosecutor committed misconduct and violated Brooks' confrontation and cross-examination rights by referring to evidence not admitted at trial; and 7) the trial court erroneously imposed a consecutive sentence for the burglary count (count 2). The People conceded that the sentence on count 2 should have been stayed pursuant to California Penal Code § 654[2] but otherwise opposed the appeal.  On December 2, 2009, the Court of Appeal issued a reasoned, unpublished opinion modifying the sentence imposed for count 2 but otherwise affirming the judgment against Brooks in its entirety.  *Brooks*, 2009 WL 4350563, at *17.  Brooks petitioned for review in the California Supreme Court, which was summarily denied on March 18, 2010.

Brooks then filed in the California Superior Court a *pro se* petition for a writ of habeas corpus, alleging that his trial counsel was ineffective for a variety of reasons.  On December 10, 2010, the superior court denied the petition with citations to *In re Marquez*, 62 Cal. Rptr. 3d 429 (Cal. Ct. App. 2007), and *In re Waltreus*, 397 P.2d 1001 (Cal. 1965), because Brooks "offer[ed]

---

[2]      Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

no evidence in support of his arguments" and "repeat[ed] arguments he raised on appeal and which were rejected by the appellate court."

Brooks then claimed that trial counsel was ineffective in a *pro se* petition for a writ of habeas corpus in the California Court of Appeal.  The appellate court also denied the petition on procedural grounds with citations to *In re Steele*, 85 P.3d 444 (Cal. 2004) ("a reviewing court has discretion to deny without prejudice a habeas corpus petition that was not filed first in a proper lower court"); *In re Harris*, 855 P.2d 391 (Cal. 1993) (denying claims that were part of the record and could have been, but were not, raised on direct appeal); and *In re Hillery*, 20 Cal. Rptr. 759 (Cal. Ct. App. 1962) ("[T]his court has discretion to refuse to issue the writ . . . on the ground that application has not been made therefor in a lower court in the first instance.").

Brooks also filed in the California Supreme Court three separate *pro se* petitions raising his ineffective assistance of counsel claims.  All three of the petitions were summarily denied, the last of which was denied on January 16, 2013.

While his state habeas petitions were pending, Brooks timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on October 27, 2010.  Brooks subsequently filed a Second Amended Petition on May 22, 2014 (Docket No. 32), which is now before the undersigned judge and ripe for disposition.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Brooks raises seven grounds for relief, a number of which contain subparts.  He first argues that the trial court erred in denying his request for an attempted voluntary manslaughter instruction.  He additionally contends that the trial court erred in failing to notify counsel of the jury's request for testimony readback and in denying the jury's

request.  Third, Brooks alleges that the trial court abused its discretion when it denied his request

for a continuance.  He also asserts that the prosecutor committed multiple instances of

misconduct.  Fifth, Brooks argues that both trial and appellate counsel rendered ineffective

assistance.  Brooks also contends that there was insufficient evidence to support the jury's

finding of attempted willful, deliberate, and premeditated murder.  Finally, Brooks claims that

the attempted murder instruction charged to the jury "improperly conflated 'a direct step' with

'intent to kill' and thus allowed the jury to convict on an implied malice theory."

III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.      _Instructional Errors_ (Grounds One and Seven)

Brooks first argues that the trial court made two errors with regard to the instructions issued to the jury.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  _See Bradshaw v. Richey_, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); _see also Williams v. Calderon_, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."  _Dunckhurst v. Deeds_, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  _Boyde v. California_, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  _Francis v. Franklin_, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  _Weeks v. Angelone_, 528 U.S. 225, 234 (2000); _Richardson v. Marsh_, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); _see Francis_, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

1.      Attempted Voluntary Manslaughter

Brooks first faults the trial court for failing to give an attempted voluntary manslaughter instruction. The Court of Appeal considered and rejected this claim as follows:

> Although attempted voluntary manslaughter is a lesser included offense of attempted murder (*People v. Heffington* (1973) 32 Cal. App. 3d 1, 11), the evidence adduced at trial failed to show any provocation that could support an attempted voluntary manslaughter conviction. As [Brooks] elsewhere points out, none of the witnesses knew of any animosity between [Brooks] and Lewis. Nor did any witness observe Lewis engage in provocation, taunting, or offensive behavior toward [Brooks] at any time during their years of friendship. Nothing remotely approaching the sort of behavior that might inspire a homicidal rage in an otherwise reasonable person can be gleaned from the record.
>
> [Brooks] imagines the jury could have found a basis for attempted voluntary manslaughter in the fact that he appeared angry at the time of the attack. [Brooks'] anger, however, had no discernable cause. The only explanation for the attempted murder was some mumbling by [Brooks] about "business."
>
> The evidence showed no provocation by Lewis. [Brooks] testified that, on the day before the attempted murder, he twice met Lewis. Both at the shopping mall and at a mutual friend's house, Lewis and [Brooks] briefly exchanged pleasantries. That night,

Lewis did not argue with anyone at the El Rancho bar.  Although the bar's security guard testified he had seen [Brooks] at the bar that evening, the guard did not observe Lewis get into a fight with anyone.  In short, the record is devoid of any provocation or taunting by Lewis on the night of the attempted murder.

Bereft of evidence supporting provocation, [Brooks] turns to the prosecutor's closing argument in an attempt to justify an attempted voluntary manslaughter instruction. "A trial court's sua sponte duty to instruct on lesser included offenses arises, however, not from the arguments of counsel but from the evidence at trial."  (*People v. Barton* (1995) 12 Cal. 4th 186, 203.)  Thus, the prosecutor's reference to "heat of passion" in describing the extreme viciousness of the attack does not provide an evidentiary foundation for an attempted voluntary manslaughter instruction.  Moreover, we do not see how the prosecutor's argument that [Brooks] was at the El Rancho bar on the night of the attack provides any basis for the manslaughter instruction.  [Brooks'] mere presence at the bar does not prove that he was provoked while there.

The total lack of evidence of provocation compels us to conclude that the trial court properly denied [Brooks'] request for an attempted voluntary manslaughter instruction.

*Brooks*, 2009 WL 4350563, at *8-9.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases.  The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding.").  Accordingly, the decision of the

California courts denying Brooks relief as to this claim was not contrary to United States

Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has recognized that "the refusal by a court to instruct a

jury on lesser included offenses, when those offenses are consistent with defendant's theory of

the case, may constitute a cognizable habeas claim" under clearly established United States

Supreme Court precedent.  *Solis*, 219 F.3d at 929.  Although Brooks argues here that there was

evidence supporting an attempted voluntary manslaughter instruction, as the Court of Appeal

reasonably concluded based on its review of the record, the evidence presented at trial simply did

not support a defense that Brooks committed the offense out of provocation or heat of passion.

Notable, Brooks did not assert any theory of involuntary manslaughter other than provocation or

heat of passion.  Rather, the defense argued to the jury that Brooks was not the person who

attacked Lewis.  Because an instruction on the lesser included offenses was not consistent with

his theory of the case and not supported by the evidence, no due process violation arose from the

failure to instruct the jury on the lesser included offenses.  *See Bradley v. Duncan*, 315 F.3d

1091, 1098-1101 (9th Cir. 2002) (finding federal due process violation where defendant's

request for instruction on the only theory of defense was denied); *Solis*, 219 F.3d at 929.

In addition to the possibility of demonstrating a due process violation based on the failure

to instruct on a theory of the defense, clearly established federal law provides that, in order to

establish a violation of his federal due process rights by the failure to give a requested jury

instruction, Brooks must demonstrate that the instruction should have been given, and that its

omission "so infected the entire trial that the resulting conviction violates due process."

*Henderson*, 431 U.S. at 154; *see Clark v. Brown*, 442 F.3d 708, 726 (9th Cir. 2006) (holding that

trial court's failure to give instruction was not harmless because there was a "reasonable probability" that, armed with the omitted instruction, the jury would have concluded that the arson was "incidental" and that the felony-murder special circumstance was not true). Here, Brooks has not carried this heavy burden because, as the Court of Appeal noted, there was a "total lack of evidence of provocation" from which the jury could conclude that Brooks was liable only for involuntary manslaughter. *Brooks*, 2009 WL 4350563, at *9. It is thus clear that the failure to instruct in this regard could not have had any adverse effect whatsoever on the jury's decision, much less the "substantial and injurious effect" required to show the error was harmful. *Brecht*, 507 U.S. at 637. Accordingly, Brooks is not entitled to relief on this instructional error claim.

     2.     CALCRIM No. 600

Brooks additionally contends that the trial court's attempted murder instruction, CALCRIM No. 600, incorrectly stated the law. The trial court instructed the jury pursuant to CALCRIM No. 600, as follows:

> The defendant is charged with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffectual step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. *A direct step indicates a definite and unambiguous intent to kill.* It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt." (Italics added.)

Brooks argues, as he did on direct appeal, that the italicized sentence "improperly suggested that evidence of a direct step established a conclusive inference of intent to kill."

The Court of Appeal declined to answer whether the italicized sentence incorrectly stated the law after concluding that, even assuming that it was erroneous, such error was harmless beyond a reasonable doubt:

> [Brooks] argues that the subject sentence wrongfully allowed the jury to find that [Brooks] intended to kill Lewis. However, the manner of [Brooks'] attack on Lewis supported a strong inference of an intent to kill. As we noted in part IB., . . . [Brooks] swung a metal bat against Lewis's head with such force that the victim was rendered unconscious. Despite the victim's immediate collapse, [Brooks] continued to rain hard blows on Lewis. The blows were not haphazard or light but were delivered forcefully to Lewis's head and back. The force of the attack caused multiple fractures to his right temporal bone, mastoid bone, right skull base, right parietal bone, and occipital bone. The injuries were so severe that Lewis could have died rather than waking up from a coma more than six weeks later. Moreover, [Brooks'] training as a vocational nurse allowed him to appreciate the damage caused by blunt force attacks. The deliberate and repeated swings of a metal bat against the victim's head supported a strong inference of an intent to kill.
>
> At trial, [Brooks] did not attempt to argue the attack failed to establish an intent to kill. Instead, his sole defense focused on proving that he was not the person who attacked Lewis. To this end, [Brooks] testified to a sequence of events that placed him away from the scene of the crime. Specifically, [Brooks] asserted that he was at home in bed when Lewis was beaten. Moreover, [Brooks] called several witnesses to show that his nonviolent nature precluded him from engaging in the sort of vicious beating that nearly took Lewis's life.
>
> During closing arguments, defense counsel did not argue that the attack failed to show an intent to kill. Instead, counsel's only reference to the manner of attack came in the form of an acknowledgement [sic] that the beating and Lewis's injuries were a "tragedy." Relying on [Brooks'] testimony about being at home during the attack, defense counsel urged the jury to conclude that some unknown person was the culprit. In short, [Brooks'] direct testimony and arguments focused exclusively on showing he was not the attacker.
>
> The subject sentence in CALCRIM No. 600 was not relied upon or mentioned by either side during closing arguments. Although the prosecutor argued that the manner of the attack demonstrated an intent to kill, he did not quote or refer to CALCRIM No. 600 in order to support his argument. The prosecutor did not refer to any instructions in urging the jury to conclude that employing a metal bat repeatedly against Lewis's head clearly showed an intent to kill.
>
> The evidence of the attack strongly indicated an intent to kill, which was not challenged by any defense evidence or argument. We are confident that the jury would have found an intent to kill even if the challenged sentence had not been included in CALCRIM No. 600. Any error in CALCRIM No. 600 was harmless beyond a reasonable doubt.

-14-

*Brooks*, 2009 WL 4350563, at *10-11.

A claim of jury instruction error is also reviewed under a harmless error standard on federal habeas review. *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003). In accordance with this review, habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). The Supreme Court recently clarified that *Brecht* incorporates the requirements of § 2254(d) (AEDPA). *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). Thus, if a state court has determined that a trial error was harmless, "a federal court may not award habeas relief under § 2254(d) unless *the harmlessness determination itself* was unreasonable." *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in original).

On independent review, the Court likewise concludes that any instructional error was harmless. For the reasons persuasively supplied by the Court of Appeal, Brooks has not established any likelihood that he was prejudiced by the instructions or that the jury would have reached a different verdict had it not received the portion of the charge that Brooks now challenges. *Brecht*, 507 U.S. at 637. The Court thus finds no basis to believe that Brooks' conviction was the result of an "extreme malfunction" of the state criminal justice system. *Richter*, 562 U.S. at 102. Brooks is therefore not entitled to relief on this ground either.

B.      <u>*Trial Court Errors*</u> (Grounds Two and Three)

Brooks additionally contends that the trial court made two other errors, first, when it "failed to notify counsel of a request for readback, and . . . denied the readback [the jury] had requested," and, second, when it denied Brooks' request for a continuance to allow him to secure an out-of-state alibi witness.  These claims will be addressed in turn.

1.      Failure to Readback Testimony

The Court of Appeal described the following facts underlying this claim:

> After several days of deliberations, the jury began anew on March 4, 2006, when a juror was replaced.  The newly constituted jury requested (1) a read back of Sisneros's testimony as it related to whether she saw [Brooks] at the El Rancho bar on the night of the crime, and (2) the date when Thornburg was interviewed by the police. Sisneros's testimony was read to the jury, and the court provided the date on which Thornburg was interviewed.
> Late that afternoon, the jury submitted a written request for a read back of "Melody Tuckers [sic ] testimony regarding seeing [Brooks] at the bar the night of February 23–24, 2006."  [Brooks] was present in court and was represented by defense counsel—albeit substitute counsel because of trial counsel's illness.
> The reporter read back Tucker's testimony as instructed by the court and requested by the jury.  During the read back, [Brooks] and defense counsel were present along with the prosecutor.
> At no time during or after the read back did defense counsel lodge any objection to the read back or the court's responses to the jury's requests.

*Brooks*, 2009 WL 4350563, at *6.

As an initial matter, the Court of Appeal rejected this argument due to a failure to object at trial.  Consequently, because the state appellate court found this claim forfeited under California's contemporaneous objection rule, it is procedurally defaulted from federal habeas review.  *Coleman*, 501 U.S. at 729-30 (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on

-16-

grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*,
*Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083,
1092-93 (9th Cir. 2004).

And even if the claim were not procedurally barred from review here, Brooks would not
be entitled to relief on it.  As the Court of Appeal stated in alternatively rejecting this claim on
the merits, "[c]ontrary to [Brooks'] contention, the record shows [Brooks] was personally
present and represented by defense counsel during the court's consideration of the read back
request, the jury's rehearing of the testimony, and the court's later discussion of the matter after
the jury departed.  Also, contrary to [Brooks'] assertion, the record shows the trial court
discussed the jury's requests for rehearing testimony by Sisneros, Thornburg, and Tucker with
defense counsel and the prosecution."  *Brooks*, 2009 WL 4350563, at *6.  The following facts
laid out by the Court of Appeal are fully supported by the record:

> During the afternoon session on March 4, 2006, the trial court and jury foreperson
> clarified the request for reading back the testimony of witnesses.  The jury foreperson
> stated the desire to hear Tucker's testimony, and the court instructed the reporter to read
> back the testimony.
> The record indicates the jury heard the portions of the testimony it wished to hear,
> including the part in which Tucker stated she did not see [Brooks] the entire night of the
> attempted murder.  After the read back, and outside the presence of the jury, the
> prosecutor noted the part of Tucker's testimony that had been read back included the
> portion in which "she said she didn't see him at the bar, but I don't think that was [a]
> direct question."  The prosecutor's remark refers to Tucker's direct examination during
> trial in which she answered as follows:
> > "Q. [Prosecutor] After the attack—okay, let me back up a little bit, I'm
> > going to strike that.  [¶] Prior to [defendant] entering the bedroom—
> > "A. Uh-huh (affirmative).
> > "Q. —did you expect [defendant] into the—in the home?
> > "A. No, I hadn't seen him the whole night."
> As both parties acknowledge in their briefs, this was Tucker's only answer
> touching on the issue of whether she saw [Brooks] at the El Rancho bar on the night of
> the attack.  For this reason, the court did not err in telling the jury that Tucker had not
> testified regarding whether she saw [Brooks] at the bar that night.

*Id.* at *7.

Likewise, as the Court of Appeal further concluded, even if the court's response was

error, such error was harmless:

> The jury actually heard a read back of Tucker's testimony that she had not seen [Brooks] prior to his attack on Lewis.  Even if the court's response had been incorrect, it is not reasonably likely that the jury's verdict would have been any different absent the error.

*Id.* (citation omitted).

For these reasons, Brooks is not entitled to relief on this claim.

2.      Denial of Continuance

Brooks also argues that the trial court abused its discretion in denying his request for a

continuance.  The Court of Appeal set out the following facts:

> Jury selection was scheduled to begin on Thursday, January 24, 2008.  Before jury selection began, defense counsel requested that trial be postponed until after the weekend so that he could locate witness, Diana Murray.  Defense counsel was worried because he was unable to reach her by telephone to confirm that she would arrive in time to testify. Counsel expected Murray to testify that she was at home with [Brooks] until a half hour before the attack occurred.  The defense also hoped to have Murray testify that [Brooks]  drove her to Chicago to visit her ailing mother, rather than to flee California.
>
> Prior to the request for continuance, the defense did no more than mail her a subpoena and call her telephone number a few times.  The trial court noted the weather in Chicago had been severe and wondered whether that explained the lack of service on Murray's telephone line.  Defense counsel indicated that he would contact the telephone company to ascertain whether the problem was temporary.
>
> The trial court denied the motion for a four-day continuance, noting that the 30 witnesses planned to be called by the parties meant that several weeks of trial were likely to occur before Murray's turn as a witness would arrive.  Further, the court indicated that it would allow Murray to testify out of order in an effort to accommodate her.  The prosecution agreed that Murray could be called out of order.  Thus, the trial court denied the requested four-day continuance.
>
> The defense made no later request for a continuance of trial to locate or accommodate Murray.  Although [Brooks] asserts the "defense still had been unable to reach Murray" at the time of closing arguments, the record does not support this assertion. The lack of testimony by Murray was discussed near the end of trial, but only

in the context of defense counsel's objection to the prosecutor's question about an out-of-court statement by Murray.  Defense counsel made no claim or showing that Murray was unavailable.

The defense rested without calling Murray as a witness.

*Id.* at *11-12.

First, although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[3]  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law.'" (quoting § 2254(d)(1))).

Nor can Brooks show that his due process rights were violated by the trial court's refusal to grant him a continuance.  The matter of continuance falls within the discretion of the trial judge.  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  "Trial judges necessarily require a great deal of latitude in scheduling trials" due to the problems associated with assembling witnesses,

---

[3]     At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

lawyers and jurors.  *Morris v. Slappy*, 461 U.S. 1, 11 (1983); *United States v. Garrett*, 179 F.3d 1143, 1145 (9th Cir. 1999).  In evaluating decisions denying continuances, reviewing courts must pay particular attention to the reasons presented to the trial judge in support of the request for continuance.  *Ungar*, 376 U.S. at 589.  The denial of a continuance will result in habeas corpus relief only if petitioner can show that he actually suffered prejudice as the result of the denial of a continuance.  *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).

Brooks has not shown any prejudice from the denial of the continuance here because the trial judge reasonably concluded that the defense had sufficient time to secure Murray's presence during the expected several weeks of trial and noted that it would accommodate her testifying out of order.  This record thus reveals that Brooks was given an ample opportunity to present his case, and he did not later inform the judge of any problems in securing Murray's testimony.

Moreover, Brooks fails to show that the denial was arbitrary or unreasonable because the record supports the Court of Appeal's determination that counsel failed to demonstrate due diligence in attempting to secure Murray's testimony.  *See Armant v. Marquez*, 772 F.2d 552, 557 (9th Cir. 1985) (explaining that "the degree of diligence by the [petitioner] prior to the date beyond which a continuance is sought" is to be considered by a court assessing the denial of a continuance motion).  As the Court of Appeal explained:

> Although counsel asserted that Murray's testimony was necessary to establish an alibi defense, counsel failed to demonstrate due diligence in attempting to secure her testimony.  When defense counsel requested the continuance, he had only "placed a few phone calls to her" after she had been mailed a subpoena.  Defense counsel offered no other evidence of any other method of contact.
>
> [Brooks] testified that, while in Chicago, he had been to the homes of Murray's mother, grandmother, and another unidentified relative.  However, the record shows no efforts to reach Murray at any of those addresses even though her grandmother's house was "a place where everyone usually is."

> A mailed subpoena and "a few phone calls" do not establish reasonable diligence in attempting to locate a key witness.  "It has been said that the word 'diligence' connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."  Defense counsel's failure to send even a follow-up letter to Murray's mailing address or to check whether her phone line was temporarily or permanently disconnected simply did not constitute diligence.

*Brooks*, 2009 WL 4350563, at *12 (citation omitted).

Accordingly, Brooks is not entitled to relief on this claim.

C.      _Prosecutorial Misconduct_ (Ground Four)

Brooks additionally alleges that the prosecutor committed four instances of misconduct

by referring to evidence not admitted at trial.  A prosecutor may not misstate the evidence or

refer to facts not in evidence.  _Darden_, 477 U.S. at 181-82; _Berger v. United States_, 295 U.S. 78,

84-85 (1935) (holding that prosecutor "overstepped the bounds of . . . propriety and fairness" by

"misstating the facts in his cross-examination of witnesses; . . . putting into the mouths of such

witnesses things which they had not said; . . . suggesting by his questions that statements had

been made to him personally out of court, in respect of which no proof was offered; . . . [and]

assuming prejudicial facts not in evidence").  However, a habeas petition alleging prosecutorial

misconduct will be granted only when the misconduct did "so infect the trial with unfairness as

to make the resulting conviction a denial of due process."  _Greer v. Miller_, 483 U.S. 756, 765

(1987) (quoting _Donnelly v. DeChristoforo_, 416 U.S. 637, 643 (1974)); _see also Darden v._

_Wainwright_, 477 U.S. 168, 181 (1986).  "[T]he touchstone of due process analysis in cases of

alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."

_Smith v. Phillips_, 455 U.S. 209, 219 (1982).

1.      Questioning of John McNabb (First and Second Alleged Misconduct)

Brooks first assigns misconduct to the prosecutor's questioning of defense witness, John

McNabb, who testified he had been at Brooks' house on the night of the attack.  The prosecutor

questioned McNabb as follows:

> "Q.... Now, according to Chris[topher Ramirez], he said that you stated . . . that
> both of you stayed at [Brooks'] for about an hour to an hour and a half, is that correct?
> "A. Yes.
> "[Defense counsel]: Object, it sounds like counsel's testifying what Chris said.  It
> was a little—question was vague.
> "THE COURT: Sustained.

"[Prosecutor]: Q. Well, Christopher's indicated [sic ] to other—to other investigators that he may—you may have stayed there for longer than just 30 minutes.  Is it possible that you stayed longer at [Brooks'] house?

"A. It could have been 45 or something like that, but it was not an hour and a half.

"Q. No hour and a half?

"A. No sir.

"[Defense counsel]: Move to strike counsel's testimony as to what Christopher told investigators.

"THE COURT: Well . . . at this point I'm going to deny the—overrule the objection.

"[Prosecutor]: Q. So it could have been longer than just 30 minutes.

"A. Um ... It—it could have. I—I—it was two years ago, I...."

The prosecutor also asked McNabb about Brooks' purchase of a bus ticket from Chicago

under someone else's name:

"[Prosecutor]: So according to you, you're saying that he's a peaceful person, correct?

"A. Yes, sir.

"Q. And that he follows the law?

"A. Yes, sir.  Or as far as I believe.  He's a frequent in the church, and all that.  I mean ...

"Q. Do you know why [Brooks] then would use a different name to purchase bus tickets when he was transferring from St. Louis to—

"[Defense counsel]: I'm going to object as speculation and beyond the scope of the direct.

"        THE COURT: Sustained. [¶] Next question."

Although the objection was sustained, defense counsel did not ask for an admonition.

The Court of Appeal denied the first claim, concluding:

We agree with [Brooks] that the prosecutor improperly referred to statements by Ramirez (who did not testify) in questioning McNabb about how long he had been at [Brooks']house on the night of the attack.  Nonetheless, we agree with the Attorney General that the error was harmless.  The prosecutor sought to show that McNabb's estimate of a half-hour stay at [Brooks'] house could have been mistaken.  McNabb acknowledged that he and Ramirez could have been at the house for as long as 45 minutes—longer than he initially allowed.

Although improperly referring to out-of-court statements made by Ramirez, the prosecutor's questioning of McNabb's time estimates did yield a concession by McNabb that his initial estimate could have been different.  Moreover, a longer time estimate by McNabb did not hurt the defense because [Brooks] himself testified that McNabb and

-23-

> Ramirez stayed for about an hour.  After they departed, [Brooks] admitted he left his house to go shopping at Safeway at about 12:30 a.m.  McNabb was unaware of what [Brooks] did after he and Ramirez left.  It was after [Brooks] left his house that the attack on Lewis occurred.  The length of McNabb's stay at [Brooks'] house did not address the main issue regarding where [Brooks] went after he left his house.  McNabb's testimony did not foreclose [Brooks'] opportunity to travel to Sisneros's house to attack Lewis.

*Brooks*, 2009 WL 4350563, at *14.

Brooks fares no better on federal habeas review.  As the Court of Appeal explained, regardless of the time estimate given by McNabb or Ramirez, Brooks admitted that, after McNabb and Ramirez left his home around midnight, he also left his home and did not return until around 1:00 a.m.  Thus, the challenged questioning did not prejudice Brooks, and he is not entitled to relief.

The Court of Appeal also denied the second claim on the ground that defense counsel did not request an admonition, which would have cured any harm, and thus the claim was not preserved for appellate review.  Under California law, in order for a claim of prosecutorial misconduct to be preserved on appeal, defense counsel must both make an objection and request an admonition from the court.  *See People v. Montiel*, 855 P.2d 1277 (1993) (claim of prosecutorial misconduct not preserved on appeal because defense counsel failed to request an admonition).  Consequently, the appellate court's reliance on this procedural rule constitutes an independent and adequate state law ground that forecloses relief here.  *See Coleman*, 501 U.S. at 750.

2.      Questioning of Donald Brooks (Third Alleged Misconduct)

Similarly, Brooks alleges that the prosecutor's questioning of Donald Brooks, Brooks'

father, about Brooks using someone else's name to purchase the bus ticket constituted

misconduct.  Here, the prosecutor asked the father, "Q. Did you know that when he acquired the

bus tickets he used a—a different name?"  Defense counsel objected, which was overruled.  The

father replied that he did not know.  The Court of Appeal also rejected Brooks' claim on

harmless error grounds.  This determination was objectively reasonable because the prosecutor

was able to secure Brooks' admission that he bought the bus ticket under another name.  Thus, as

the Court of Appeal reasonably concluded, "[t]here was no error or prejudice resulting from the

jury hearing about the fact of [Brooks'] travel under a false name when he himself admitted it."

*Brooks*, 2009 WL 4350563, at *15.

3.      Questioning of Brooks (Fourth Alleged Misconduct)

Finally, Brooks assigns error to the prosecutor's asking Brooks, who testified on his own

behalf, about a statement Murray had made to the prosecution's investigators:

> "Q. Why is it then when our investigator spoke with Diana Murray she indicated
> to us on June—
> "[Defense counsel]: Objection.
> "THE COURT: Excuse me, one moment.
> "[Defense counsel]: Objecting because Counsel is about to testify to hearsay.
> "[Prosecutor]: The question isn't even out, Judge.
> "THE COURT: I think the objection otherwise is well taken, if it does call for
> hearsay, it appears to.
> "[Prosecutor]: Q. According to Ms. Murray she said she didn't know where you
> went out that night.  Did you go to Safeway that night?
> "[Defense counsel]: Same objection.
> "THE COURT: Sustained.
> "[Defense counsel]: Ask that it be stricken.
> "THE COURT: Stricken."

The Court of Appeal rejected this claim, like Brooks' claim referring to the question to Lewis regarding Brooks' bus ticket purchase, on the ground that defense counsel objected but did not ask that the jury be admonished. *Brooks*, 2009 WL 4350563, at \*15. This claim is therefore also procedurally barred from federal review. *See Coleman*, 501 U.S. at 750. Brooks is thus not entitled to relief on any of his prosecutorial misconduct claims.

D.      *Ineffective Assistance of Counsel* (Ground Five)

Brooks further alleges that his trial counsel provided ineffective assistance for a number of reasons. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that

determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Brooks must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

1.    Claim Raised on Direct Appeal

In conjunction with his prosecutorial misconduct claim, Brooks argued on direct appeal that his trial counsel rendered ineffective assistance of counsel.  The Court of Appeal considered and rejected this claim as follows:

> [Brooks'] claim of ineffective assistance does not refer to the failure to request an admonishment of the jury after improper questioning, but instead concerns a lack of objection to the prosecutor's closing argument.  Specifically, [Brooks] focuses on the following argument by the prosecutor: "Where is Ms. Murray?  The one person, their one person that can save [Brooks] right now is Diana Murray.  Is [sic ] where is she?  She's a logical witness.  She is the one person that can tell us, 'We had chicken wings that night. That morning.  We went to Chicago.  We took this route.  We took these hotel rooms.' She's the one person.  And according to [Brooks], they were really close, he was thinking of marrying her.  They were girlfriend and boyfriend.  She was living with him.  She moved from Chicago to San Joaquin County."
> [Brooks] argues that defense counsel should have objected to the prosecutor's argument because Murray was an unavailable witness.  Not so.  The defense never established that Murray was unavailable.

As we explained in part VA., *ante*, defense counsel stated he was unable to reach Murray prior to trial.  By making only "a few phone calls to her" after mailing a subpoena, defense counsel did not demonstrate anything more than cursory efforts to secure Murray's testimony.  The record is devoid of efforts to reach Murray at any of the three houses in Chicago belonging to her family members.  [Brooks'] failure to demonstrate that Murray was unavailable meant that it was "appropriate and permissible" for the prosecutor to comment on the failure to call her as a defense witness.  Lacking a basis for objecting to the prosecution's comment on the defense's failure to call Murray as a witness, counsel was not ineffective for failing to object.

The record demonstrates no prejudice to [Brooks] resulting from the prosecutor's cross-examining of defense witnesses regarding evidence outside the record or due to defense counsel's failure to object to the prosecution's comment on the failure to call Murray as an alibi witness.  The questions and closing argument that [Brooks] challenges as misconduct all focused on events before and after the attack on Lewis.  Thus, the evidence that it was [Brooks] who brutally beat Lewis in front of Sisneros and Tucker was not undermined.  [Brooks'] argument thus cannot succeed for lack of prejudice.

*Brooks*, 2009 WL 4350563, at *15-16.

In his Petition before this Court, Brooks attaches a letter dated January 31, 2008, and addressed to Murray requesting that she call defense counsel.  As that letter was not before the Court of Appeal, it is not properly considered here.  *See Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) (holding that federal review of habeas corpus claims under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits").  In any event, it is insufficient to establish that Murray was an unavailable witness.  *See Whelchel v. Washington*, 232 F.3d 1197, 1209 (9th Cir. 2000) (limited efforts are insufficient to establish that a witness is unavailable).  As such, the Court of Appeal's conclusion that defense counsel had no basis to object to the prosecution's comment on the failure to call Murray as a witness was not objectively unreasonable, and Brooks' claim here must be denied.

2.      Claims Raised on Collateral Review

Brooks also raised a number of ineffective assistance claims in state habeas petitions to the California Supreme Court, which he again raises before this Court.

He first contends that his trial counsel provided ineffective assistance when he did not argue that the prosecution failed to establish Brooks' intent to kill.  But as previously discussed, the defense theory was that Brooks did not attack Lewis.  The record therefore supports that counsel may have had a sound tactical reason for not arguing that Lewis lacked intent to kill so that he could focus on Brooks' defense that he did not commit the attack.

Brooks also argues, in relation to his prosecutorial misconduct claims, that trial counsel was ineffective for failing to request an admonition in the two circumstances noted above.  The superior court denied that claim for lack of evidence demonstrating deficient performance and prejudice.  This dearth of evidence also dooms Brooks' claim here.  *See, e.g.*, *Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting *Strickland* claim where petitioner presented no evidence of deficient performance "other than [the petitioner's] own self-serving statement"); *see also Gentry v. Sinclair*, 705 F.3d 884, 900 (9th Cir. 2013) ("Because 'counsel is strongly presumed to have rendered adequate assistance,'" it was not unreasonable for state court to reject petitioner's ineffective assistance of counsel claim when petitioner provided no evidence to support the claim (quoting *Strickland*, 466 U.S. at 690)); *Sandgathe v. Maass*, 314 F.3d 371, 379 (9th Cir. 2002) (affirming denial of ineffective assistance of counsel claim where petitioner presented no evidence in support of claim).  Indeed, this Court's independent review of the record does not support a finding that counsel's failure to request an admonition prejudiced Brooks, as it is not reasonably likely that such admonition would have altered the jury's verdict.

Brooks also faults appellate counsel for failing to raise the issue of trial counsel's ineffectiveness. But again, because Brooks fails to establish trial counsel's ineffectiveness, he necessarily fails to demonstrate that appellate counsel should have raised it on direct appeal. Brooks additionally argues that appellate counsel should have substantiated his direct appeal claim that he was prejudiced by his trial counsel's absence during the readback of testimony by "contact[ing] trial counsel to verify whether he was aware of [the] jury's request for readback on March 5th." But appellate counsel could not have included such evidence on direct appeal, which relies only on the record itself. *See United States v. Lillard*, 354 F.3d 850, 853 (9th Cir. 2003); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989). Thus, Brooks fails to show that substantiating his claim on appeal in this way would have presented grounds for reversal. *See Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel's failure to raise issues on direct appeal does not constitute reversal when appeal would not have provided grounds for reversal). Consequently, Brooks is not entitled to relief on any of his ineffective assistance claims either.

E.     *Insufficiency of the Evidence* (Ground Six)

Finally, Brooks argues that the evidence against him is legally insufficient to support his conviction. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In

making this determination, this Court may not usurp the role of the finder of fact by considering

how it would have resolved any conflicts in the evidence, made the inferences, or considered the

evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical

facts that supports conflicting inferences," this Court "must presume–even if it does not

affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the

prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system

is "that a state court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546

U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the

state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be

accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory

authority over state judicial proceedings and may intervene only to correct wrongs of

constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith

v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if

accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330.

The United States Supreme Court has recently even further limited a federal court's scope of

review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

In support of his claim, Brooks points to the lack of evidence demonstrating motive or his planning the attack. But under federal law, like California law, "lack of evidence presented at trial to establish a motive on the part of the defendant to kill the victim does not preclude a reasonable juror from finding sufficient evidence of premeditation." *United States v. Reza-Ramos*, ___ F.3d ___, 2016 WL 890777, at *8 (9th Cir. Mar. 9, 2016). All of the evidence and testimony he identifies in support of his claim was before the jury for its assessment. Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. The Court of Appeal found the following in rejecting Brooks' sufficiency of the evidence claim on direct appeal:

> Here, the evidence showed [Brooks] brought the weapon with him because Sisneros did not keep a baseball bat in her house. [Brooks'] first blow to Lewis's head landed with such force that the victim immediately collapsed in an unconscious state. [Brooks] continued to employ the bat over and over again in striking the defenseless victim in the head and on his back. [Brooks'] training and work as a licensed vocational

nurse meant that he understood the consequences of repeatedly hitting someone in the head with a metal baseball bat.

The vicious and sustained nature of the attack provided the jury with ample evidence to find [Brooks] acted with a premeditated and deliberate intent to kill Lewis. That the planning or method of the attack was not complex makes no difference because "the absence of protracted and elaborate planning activity is not 'fatal' to finding sufficient evidence of premeditation . . . ." (*People v. Millwee* (1998) 18 Cal. 4th 96, 134.)  As Lewis's emergency room physician testified, the victim could have died from the injuries.  Instead, Lewis's multiple skull fractures helped prevent fatal brain swelling. It is a mere fortuity that [Brooks] did not face murder—rather than attempted murder—charges.

The evidence does not need to show why [Brooks] tried to kill Lewis in order to establish that the nature of the attack, combined with [Brooks'] medical knowledge, proved an intent to kill.  "One may kill with or without a motive and still be found to have acted with express malice.  An inference of intent to kill drawn on evidence of a purposeful shooting with lethal force under all the attendant circumstances can support a conviction of attempted murder even without evidence of motive." (*People v. Smith* (2005) 37 Cal. 4th 733, 741–742.)  So too, evidence of repeated forceful blows to the head with a metal baseball bat supports an attempted murder conviction even in the absence of any indication of motive.

The evidence adduced at trial amply supported the jury's conclusion that [Brooks] committed attempted willful, premeditated, and deliberate murder.

*Brooks*, 2009 WL 4350563, at *5-6.

Viewing that evidence in the light most favorable to the verdict, the record does not compel the conclusion that no rational trier of fact could have found proof of Brooks' guilt. Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt that Brooks was guilty of the attempted murder of Lewis.  Brooks is thus not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Brooks is not entitled to relief on any ground raised in his Second Amended Petition.

**IT IS THEREFORE ORDERED THAT** the Second Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

-33-

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 13, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge